J-S07031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KOLTON L. KIRBY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANGELICA READ | : | |
| | : | |
| Appellant | : | No. 1400 MDA 2024 |

Appeal from the Order Entered August 29, 2024
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2023-20247

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: APRIL 8, 2025**

Appellant, Angelica Read ("Mother"), appeals from the order entered in the Lebanon County Court of Common Pleas, which awarded Appellee, Kolton L. Kirby ("Father") shared physical custody of the parties' minor child ("Child").  We affirm.

The trial court opinion set forth the relevant facts and procedural history of this appeal as follows:

> [Father] and [Mother] are the biological parents of [Child], born May … 2021.  Mother and Father were never married but lived together for a portion of time beginning in August of 2020 until September of 2021.  Mother has two children from a previous relationship, R.R. and L.R., who lived with the parties for the entirety of the time they resided together. At the time the parties separated, there was no custody order in place.  However, Mother had primary custody of [Child] and Father had periods of custody as the parties agreed.
>
> On June 2, 2023, Father filed a petition for emergency

custody contemporaneously with a complaint for custody of [Child], seeking shared legal and physical custody. On June 29, 2023, Father withdrew [the] petition for emergency custody, and a custody conciliation conference was scheduled for September 12, 2023. As the parties were unable to reach a resolution in this matter at the first custody conciliation conference, a second conciliation conference was scheduled for a later date. However, at the first conference, the parties did consent to a temporary custody order and an interim custody schedule was entered on September 29, 2023.

* * *

The second conciliation conference occurred on December 11, 2023. Because the parties were no longer able to agree on the temporary order, a pretrial conference was scheduled and occurred on January 8, 2024. On December 27, 2023, Mother filed an emergency petition for special relief. A hearing was held on January 11, 2024, regarding the emergency petition.

At the Hearing, Megan Vachon, a caseworker for Children and Youth Services ("CYS"), testified that the agency received a generalized report at the end of September 2023 about one of the female children—the stepsibling of [Child]. The agency interviewed Mother's daughters, R.R. and L.R., as part of a minimal facts interview. Both girls reported seeing Father's private area and identified it on an anatomically correct diagram. Due to ongoing concerns, CYS referred the matter to Childline and Child Protective Services ("CPS") and filed a police referral for a sexual abuse investigation.

A Child Advocacy Center ("CAC") forensic interview was held on November 9, 2023, with Ms. Vachon, a detective from the Lebanon County District Attorney's Office, and a representative from Victim Witness. An interview with L.R. was attempted, but was unsuccessful due to her lack of attention span. Regarding the interview with R.R., Ms. Vachon stated that the child came into the interview and initially just "threw things" out there. Ms. Vachon explained that R.R. came in and stated that she saw Father's penis and then asked to leave within two minutes. However, Ms.

Vachon testified that R.R. later disclosed in the interview that Father made her suck his penis in the basement. This was the first time CYS heard of this particular allegation. However, the child was unable to provide additional information about the incident, such as the home's address or the number of times it occurred.

Following the forensic interview, CPS determined that the allegations were indicated regarding R.R. but unfounded for L.R. CPS did not take further action as the children were no longer residing with Father. Ms. Vachon was questioned about any indications that the child might have been "coached" into making the specific statements. In response, Ms. Vachon testified that initially she did have concerns about the possibility of coaching because it appeared the children would enter the interview, say what they needed to say, and then immediately want to leave. On direct examination, Ms. Vachon concluded, however, that she was convinced that the allegations were true.

On cross-examination, Ms. Vachon explained that on October 26, 2023, an individual called the agency to express additional concern about the comments made by the children (R.R. and L.R.) about Father. Ms. Vachon was asked about the fact that a PFA hearing was scheduled for the day after the new allegations were made. In response, Ms. Vachon stated that she did not become aware of the PFA hearing until after it occurred.

As part of the Hearing on January 11, 2024, the [c]ourt also heard testimony from Detective David Shaffer. Detective Shaffer testified that he was present for the CAC interviews with R.R. and L.R. He further testified that he spoke to both Mother and Father as a part of his investigation. According to Detective Shaffer's testimony, he was unable to form an opinion of where or when these allegations could have occurred. At the conclusion of his investigation, it was decided that filing of charges [was] not warranted due to the inconsistent accounts in this case. Detective Shaffer further explained that the discrepancies included living arrangements, timing of the alleged incident in relation to the parties' residences and changed stories.

The court also heard testimony from Father, who reported

that he had not seen [Child] for five months. He further testified that an agreement was reached at a custody conciliation conference on September 12, 2023, but that he was never able to exercise his periods of custody due to a PFA petition filed by Mother. The PFA was signed on September 26, 2023, but the basis of the allegations related back to September 4, 2023; approximately a week prior to the conciliation conference. Mother voluntarily withdrew the PFA on October 27, 2023. However, Father testified that at the time of the scheduled PFA hearing, he found out that a report was made to CYS regarding Mother's two older children; R.R. and L.R. Father testified regarding multiple letters from CYS stating that they received referrals against him but that all reports were eventually determined invalid or unfounded.

As to the specific allegations involving R.R. and L.R., Father testified during his interview with CYS, he was told that the incident allegedly occurred in a basement. According to Father's testimony, the only place he lived with a basement was when he resided on 5th Street. Father testified that Mother and the children only resided at that address for less than two months. He also stated that R.R. would have been three or four years old at the time and that his mother was living with them at that address. According to Father's testimony, the basement door at the Fifth Street address was locked because no one ever went down there and was obstructed by a number of objects. He added that he would have to bend over in order to walk down the stairs because he was unable to stand up in the basement. He denied that the girls were ever in the basement and denied ever having inappropriate sexual contact with Mother's children. In his testimony, Father further stated that Mother threatened to deny him access to [Child] unless he gave her money when he informed her [that] he was leaving.

At the conclusion of the hearing, the judge granted Father periods of supervised custody to be supervised by [Paternal Grandmother]. On February 13, 2024, Mother filed a motion for reconsideration and petition for special relief. Following a rule to show cause, Father filed a response to petition for reconsideration. On May 30, 2024, a custody trial was held in this matter. The trial yielded the following pertinent facts.

- 4 -

During the custody trial, the [c]ourt heard testimony from Father who stated that he currently lived with his mother, stepfather, grandmother, brother, niece, and nephew, and works the first shift at ACE Hardware from 6:00 a.m. to 4:30 p.m., Sunday through Thursday. Father testified about his attachment to [Child], describing things [Child] likes to do such as playing outside, eating favorite foods, watching movies, and playing with toys. Father also described family gatherings and that [Child] has a good relationship with his cousins. Father also testified that Mother does not notify him of [Child's] doctor appointments. As previously testified at the earlier hearing, Father denied the allegations of sexual abuse involving Mother's daughter in the basement when he lived in the house on Fifth Street in Myerstown. He stated that he worked the third shift at the time, that someone was always present, and that he was never alone with the girls. Father also testified that the basement in the house was cluttered and had a low ceiling and that he never used the basement bathroom.

Father also testified about how his relationship with Mother was bad after they split, with her refusing to respond to messages and denying him access to [Child]. Father again testified that Mother demanded money until [Child] turned 18 and threatened to keep the child away from him. Father also described the visitation exchanges as difficult because Mother would not hand over [Child] right away. Father testified that this made it difficult for [Child] to want to go with him and made the child upset. Several text messages between the parties were admitted into evidence which reflected a hostile and tumultuous relationship between the parties. Father testified about PFAs filed against him by Mother after a custody agreement was in place. Although the PFA was withdrawn, he was unable to see [Child] under the agreement due to additional allegations being made to CYS. Father also testified about an incident where he took [Child] for a haircut, and Mother became upset and threatened to file a contempt petition. Father stated he is seeking 50/50 custody and wants Mother to stop interfering with his periods of custody. He acknowledged the child's bond with Mother and does not want to hinder it.

The [c]ourt also heard testimony from Mother, who testified

- 5 -

that she and Father lived together at the Fifth Street address for four months. Mother stated on cross-examination that her two daughters would have been three and four years old at the time she lived with Father at that address. She also testified that there was a bathroom in the basement, and that Father used it frequently. Mother also testified that Father was alone with her daughters when she took a shower. She also testified that she was the primary caregiver when they were together. Mother testified that she is unemployed and that her last job was in 2016, before she had any children. She stated that her income is based on child support for her daughters and help from her family. She stated that she currently resides with her mother who assists with childcare. According to Mother's testimony, she has a good relationship with all her children. Mother claims [Child] began having nightmares and changed behaviors since Father's custody, describing his behavior as weird and sexual, and that he became more violent towards his stepsisters. She also testified that [Child] at one point was able to speak, but that he became nonverbal when shared custody began.

Mother further testified that she did not contact a specialist about [Child's] speech issues but has taken him to the doctors regarding the nightmares. Mother also testified that [Child] is not in daycare, that her two daughters are homeschooled and are currently in first and third grade, and that she intends to homeschool [Child] in the future. She stated that [Child] only interacts with his stepsisters and her family, with no other real interactions with other children. On cross-examination, Mother admitted to filing a PFA against Father before custody could begin on September 26, 2023, and admitted that allegations on the PFA stemmed from an incident that allegedly occurred on September 4, 2023. She also admitted to withdrawing the PFA after the CYS investigation began, and Father was prevented from enjoying visits with [Child].

Aside from the sexual abuse allegations, Mother also voiced concerns about Father's parenting abilities. Mother testified that she does not want shared custody and wants the child to have no contact with Father or his family.

The [c]ourt also heard testimony from [Paternal

Grandmother]. [Paternal Grandmother] testified that Mother lived with her on and off including the residence on Fifth Street in Myerstown. According to her testimony, Mother only lived at the Fifth Street address for two months prior to their eviction. [Paternal Grandmother] added in her testimony that ten people resided at the Fifth Street address. [Paternal Grandmother] reiterated that the basement was a tight space with a low ceiling and that the door was blocked by storage. She also stated in her testimony that she was present for the custody exchanges and echoed Father's testimony about the difficulties, including being videotaped by Mother.

Regarding the allegations against Father, [Paternal Grandmother] testified that the accusations did not begin until after the temporary custody papers were filed. She also stated that she was so worried about future allegations that she felt the need to put cameras up around her house. In her testimony, [Paternal Grandmother] also expressed her general concern that Mother will do anything to keep the child away from them.

In chambers, the Judge conducted separate interviews with Mother's two daughters, R.R. and L.R. Both parties' counsel was present as well as a court reporter. Both girls appeared talkative and hyperactive. At times, both girls were incomprehensible and difficult to understand. Moreover, upon inquiry, neither child was able to spell her name or determine which letter in the alphabet it started with.

\* \* \*

Following the hearing, an amended temporary custody order was entered, and a review hearing was scheduled for August 27, 2024. The amended temporary custody order stated that Father shall have periods of custodial visitation of [Child] to be supervised by Paternal Grandmother….

\* \* \*

All other provisions of the custody order dated September 29, 2023, were to remain in full force and effect with the added provisions that Mother shall have her daughters, R.R. and L.R., undergo an educational assessment and be

enrolled in school as soon as possible, Mother should enroll [Child] in counseling as soon as possible, and that parties should be able to talk to [Child] via phone from 7:00 p.m. until 7:15 p.m. during the other party's period of custody.

The review hearing took place on August 27, 2024. At the review hearing, an order of adjudication from the CYS appeal was entered into evidence, indicating that CYS had withdrawn the indication of finding due to a lack of evidence. An order denying reconsideration was also included as evidence.

The [c]ourt heard testimony from Father, who stated that after the CYS appeal hearing, he received a letter from CYS stating that another referral had been made against him, but that it was unfounded, and no further action was taken. Father also testified about a dog bite injury [Child] sustained while in the care of Mother. The injury required surgery, and [Child] lost a portion of his ear. Father testified that Mother told him multiple stories about what had happened. Father also testified that Mother was interfering with phone calls, making it difficult to talk to [Child]. He also stated that the exchanges for visitation were going well until after the CYS appeal hearing.

The [c]ourt also heard testimony from [Paternal Grandmother], who testified about the exchanges. She echoed Father's testimony that the exchanges were going well until after the appeal hearing, when Mother was late to an exchange and took action to pull [Child] back to her when the child tried to approach Father. [Paternal Grandmother] also testified that individuals with Mother would videotape the exchanges, circle around after the exchange took place, and make inappropriate comments toward Father in front of [Child]. However, [Paternal Grandmother] noted that the exchanges eventually returned to being civil with no communication.

The court also heard testimony from Mother, who denied making another referral to CYS. She added that the dog bite happened when [Child] was giving the dog a treat, and that the dog had never bit anyone previously. According to Mother, the exchanges are fine, that she does not hold the child back and no one videotapes them. She acknowledged

that she was late for an exchange but stated it was due to traffic.

Following the hearing, an order regarding child custody was entered directing custody as follows: Mother on Sunday at 7:00 p.m. until Tuesday at 7:00 p.m., Father on Tuesday at 7:00 p.m. until Thursday at 7:00 p.m., with alternating weekends running from Thursday at 7:00 p.m. until Sunday at 7:00 p.m. The order also included that the parties must enroll [Child] in counseling as soon as possible, take [Child] to IU-13 for an evaluation to determine if he is eligible for early intervention services, and enroll [Child] in public school at the appropriate time.

(Trial Court Opinion, filed 10/23/24, at 2-11) (internal footnote, record citations, and unnecessary capitalization omitted). Mother timely filed a notice of appeal and concise statement of matters complained of on appeal on September 27, 2024.

Mother now raises seven issues for our review:

Whether the trial court committed an error of law and/or fact when it modified the parties' physical and legal child custody in favor of [Father] in the order of August 29, 2024 based on evidence presented at the hearings?

Whether the trial court committed an error of law and/or fact when it failed to conduct a risk of harm hearing with respect to [Father]?

Whether the trial court committed an error of law and/or fact in its analysis of the 23 Pa.C.S.A. § 5328 factors in place at the time of the order?

Whether the trial court committed an error of law and/or fact in determining to grant Father physical custody time?

Whether the trial court committed an error of law and/or fact when it determined the physical custody granted to [Father] posed no risk of physical harm to the minor child?

Whether the trial court committed an error of law and/or fact when it determined that Father did not engage in a sexual assault on minor children other than the minor child subject to the action?

Whether the trial court committed an error of law and/or fact when it ordered the parties to enroll the minor child in public school?

(Mother's Brief at 9-11).[1]

Initially, Mother contends that the court failed to give adequate weight to certain evidence concerning many of the statutory custody factors. Regarding the custody factors pertaining to Child's safety, Mother emphasizes her daughters' statements about sexual abuse, as well as Mother's own testimony that Child suffered bruises during visits with Father. Mother insists that the court demonstrated a bias against her by penalizing Mother for legitimate concerns regarding CYS's investigation of Father. Mother adds:

Clearly, the evidence to support the allegation was sufficient enough for CYS to make a determination of indicated during its investigation. The mere fact that on appeal, the indicated report was expunged is not completely dispositive of the veracity of the allegations.

(*Id.* at 25).

---

[1] In its opinion, the trial court correctly recognized that many of Mother's issues are related. (*See* Trial Court Opinion at 11-12). Thus, the court provided analysis for three discrete claims: **1)** whether it erred in evaluating the custody factors; **2)** whether it erred in determining that Father posed no risk of harm to Child; and **3)** whether it erred by ordering Child's enrollment in public school. After reviewing Mother's appellate brief, we agree that her issues can be consolidated, and we group Mother's issues in the same manner as the trial court's opinion.

- 10 -

Further, Mother maintains that Father cannot facilitate meaningful relationships for Child:

> Mother testified as to the familial relationships, and the friendships she fosters for [Child], as well as noting that [Child] had his own room. Father and Paternal Grandmother both testified that [Child] shares a room with Father and with other individuals in an open finished basement with very little privacy. While Father testified that [Child] interacts with his cousins, there was little testimony that Father made attempts to find age-appropriate friends for [Child].

(*Id.* at 32-33).

Mother also complains that that the court "credited only slightly" the evidence demonstrating Mother's consistent performance of parental duties, despite Mother having provided almost all care for Child since his birth. (*Id.* at 32). Further, Mother posits that the court engaged in a "capricious disregard of the evidence" when evaluating the level of conflict and cooperation between the parties. (*Id.* at 35). By finding against Mother on this factor, the court allegedly failed to consider Mother's testimony that she "sought only to act in protection of [Child] amid allegations of abuse." (*Id.*) Based upon the foregoing, Mother concludes that this Court must vacate the custody order and remand for further proceedings. We disagree.

The following principles apply to our review of a custody order:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the

- 11 -

evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 457-58 (Pa.Super. 2021) (quoting *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa.Super. 2018)).

[I]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party.

*E.B. v. D.B.*, 209 A.3d 451, 468 (Pa.Super. 2019) (quoting *King v. King*, 889 A.2d 630, 632 (Pa.Super. 2005)).

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)).

The Child Custody Act provides:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted

- 12 -

consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

(1)     Which party is more likely to ensure the safety of the child.

(2)     The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1)     The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2)     Violent or assaultive behavior committed by a party.

(2.3)     Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3)     The parental duties performed by each party on behalf of the child.

(4)     The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5)     The availability of extended family.

(6)     The child's sibling relationships.

(7)     The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8)     The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the

safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

The parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting *S.M. v. J.M.*, 811 A.2d 621, 623 (Pa.Super. 2002)).

Instantly, the court thoroughly explained its decision-making process and how it weighed the evidence for each statutory factor. (*See* Trial Court Opinion at 14-19). Although the court considered evidence from both parties, the court found Mother's testimony to be minimally credible with respect to Section 5328(a)(2.3), (3), (4), (8), (9), (10), and (13). After a careful review of the record, we conclude that the evidence supports the trial court's findings. While Mother essentially asks this Court to reweigh certain factors in her favor, a party cannot dictate the amount of weight the trial court places on the evidence. *See R.M.G., Jr., supra*. Because we cannot say that the court abused its discretion in this regard, Mother is not entitled to relief on her first set of claims. *See E.C.S., supra*.

Mother next argues that the court erred by failing to conduct a separate hearing concerning the risk of harm posed by Father. Citing 23 Pa.C.S.A. § 5329.1, Mother asserts that the court "failed to consider the risk of harm during the custody trial and then capriciously disregarded the risk of harm" when crafting the final custody order. (Mother's Brief at 26). Again, Mother insists that the court improperly awarded shared physical custody by erroneously disregarding her daughters' statements about purported sexual abuse. Mother concludes that this Court must vacate the custody order on these bases. We disagree.

- 15 -

J-S07031-25

The Child Custody Act provides:

**§ 5329.1.   Consideration of child abuse and involvement with protective services**

**(a)   Information sharing.**—In accordance with section 6340(a)(5.1) (relating to release of information in confidential reports), where a party seeks any form of custody, subject to the examination of the parties, the court shall determine:

(1)       With respect to child abuse under Chapter 63 (relating to child protective services) or a child who is a victim of a crime under 18 Pa.C.S. (relating to crimes and offenses) which would constitute abuse under Chapter 63:

(i)       Whether the child is the subject of an indicated or founded report of child abuse.

(ii)       Whether a party or a member of the party's household has been identified as the perpetrator in an indicated or founded report of child abuse.

(iii)       The date and circumstances of the child abuse.

(iv)       The jurisdiction where the child abuse investigation took place.

23 Pa.C.S.A. § 5329.1(a)(1).

"The court's duties under Section 5329.1 concerning the abuse allegations as part of rendering the custody decision are independent of the duties of CY[S] and law enforcement to investigate suspected child abuse under the [Chapter 63 of the Domestic Relations Code, known as the Child Protective Services Law]." ***Z.P. v. K.P.***, 269 A.3d 578, 593 (Pa.Super. 2022). There is no dispute that the trial court possesses the authority to interview children and act to protect the children's best interests as it pertains to the

- 16 -

custody action.  ***See id.*** 592-93.  Likewise, the court has a duty to consider any allegations of child abuse in rendering its custody decision.  ***Id.*** (citing 23 Pa.C.S.A. §§ 5328(a)(2.1), 5329.1).

Instantly, the court expressly determined that Father was not identified as a perpetrator in an indicated or founded report of child abuse:

> In this case, there were reports of alleged sexual abuse with the father in the custody matter as the alleged perpetrator. Initially, CYS determined that the allegations were indicated regarding one of Mother's daughters but [were] unfounded for the other.  However, Father appealed and after a CYS hearing, it was determined that due to lack of evidence the indication of finding was withdrawn.  All other reports and allegations made to CYS regarding Father were unfounded or invalid.  Additionally, the [c]ourt interviewed the two minor children who were allegedly implicated in the sexual abuse allegations.  At the time of the interviews, both children came in and without being prompted, blurted out that Father made them perform sexual acts on him.  The children could not provide any additional facts about the allegations and seemed to want to leave immediately following the disclosures.  Given the circumstances, the [c]ourt concluded that the testimony was suspicious and influenced.

> As there was no indicated or founded report of child abuse perpetrated by Father, this [c]ourt determined it was not necessary to conduct any analysis under the plain language of Section 5329.1(a) before ordering shared physical custody.  Moreover, neither party presented any evidence at the time of the review hearing that demonstrated to the [c]ourt that a risk of harm hearing was necessary.

(Trial Court Opinion at 20-21).

Our review of the record supports this determination.  At the review hearing, Father's counsel submitted multiple documents into evidence to dispel the validity of Mother's abuse allegations.  First, counsel offered the

order and adjudication entered in conjunction with Father's request to expunge the reports naming him as a perpetrator of child abuse. (*See* Father's Exhibit 8, entered 8/27/24). These documents confirmed that: 1) Father received an administrative hearing on his appeal on July 23, 2024; 2) at the conclusion of the hearing, CYS informed the administrative law judge that it would not pursue its allegations against Father, and it would remove Father's name from the ChildLine registry; 3) the judge recommended that the report of child abuse be expunged; and 4) the Department of Human Services ("DHS") ordered that the judge's recommendation be adopted in its entirety. Further, Father's counsel offered the August 23, 2024 order denying Mother's request for rehearing or reconsideration of the matter. (*See* Father's Exhibit 9, entered 8/27/24).

Father also testified about additional abuse allegations at the review hearing. Father explained that he received a letter from CYS, dated August 12, 2024. The letter explained that CYS had received another referral concerning Father on July 12, 2024. CYS investigated the matter, and it determined that the concerns were invalid. (*See* N.T. Hearing, 8/27/24, at 9). Father's counsel submitted the letter into evidence, and Mother's counsel raised no objection. (*See* Father's Exhibit 10, entered 8/27/24). Here, Father's evidence supported the court's conclusion that it was unnecessary to conduct any further risk of harm analysis. *See* 23 Pa.C.S.A. § 5329.1(a)(1)(ii) (explaining that court must determine whether party has been identified as

perpetrator **in indicated or founded report** of child abuse).

Moreover, the court conducted *in camera* interviews with Mother's daughters, R.R. and L.R. Again, our review of the record supports the court's finding that the children's allegations appeared suspicious. For example, R.R. inserted her allegation against Father into an otherwise innocuous discussion about her relationship with Child:

> [R.R.:] [Child] loves cars. Like he won't share his cars with us.
>
> [THE COURT:] [Child] will not share his cars. Do you have cars that you won't share with him?
>
> [R.R.:] Yep, I play blocks with him; and I play Play-Doh with him.
>
> [THE COURT:] Well, that's really nice. If you were going to use one of his cars, which one would you like to use? Is there one that you like better than the rest of his?
>
> [R.R.:] I'd like to use this one, and [Father] suck his penis.
>
> [THE COURT:] Huh. So help me understand that? How did that happen?
>
> [R.R.:] He—he made me go down the stairs. He made me do it.
>
> [THE COURT:] Oh.
>
> [R.R.:] And I—he made me suck his penis.

(N.T. *In Camera* Proceedings, 5/30/24, at 4-5). R.R. defined "penis" as "a boy part," but she could not remember when the incident occurred. (**See id.** at 5-6). R.R. offered no further details about the purported abuse, expressed

- 19 -

a desire to see Mother, and effectively ended the interview. (*Id.* at 9-13).

The subsequent interview with L.R. followed a similar pattern. Again, the child offered her allegations against Father without any prompting:

[THE COURT:]      So who do you live with in your house?

[L.R.:]      Mommy.

[THE COURT:]      Okay.

[L.R.:]      And I'll tell you what [Father] did.

[THE COURT:]      I'm sorry. What did you say?

[L.R.:]      I want to tell you what [Father] did.

[THE COURT:]      Okay.

[L.R.:]      (Inaudible).

[THE COURT:]      What was that?

[L.R.:]      [Father] made [R.R.] suck his penis.

[THE COURT:]      Oh, how do you know that?

[L.R.:]      Because I saw it.

(*Id.* at 14). L.R. did not provide any additional details about the alleged abuse, and she mumbled another inaudible response when the court asked about her feelings on the incident. Shortly thereafter, L.R. asked "to go back to Grandma," and the interview ended. (*Id.* at 15).

As soon as L.R. exited chambers, the court opined:

Okay. Here are my thoughts. I have never had anybody come in and say blah blah blah like that. So it sounds a whole lot like somebody said go in and say this, and you can come right back out. I don't know that I can make a

- 20 -

decision based on that [because] that's just what I think it sounds like. I would like to wait to see what the outcome of [Father's] appeal [of the CYS investigation] is to make any groundbreaking decisions.

(*Id.* at 16). Mindful of the applicable standard of review, we defer to the presiding trial judge who viewed and assessed the witnesses. *See E.C.S., supra*. Consequently, Mother is not entitled to relief on her second claim.

In her final issue, Mother complains about the court's directive to enroll Child in public school. Mother contends that the court failed to conduct a hearing "to determine whether the best interests of [Child] would be served by allowing Mother to homeschool him or enrolling him in public [school]." (Mother's Brief at 30). Rather, Mother asserts that the court made its assessment based on its interviews with Mother's daughters. Mother emphasizes that "[n]o expert or educational testimony or evidence was taken to determine whether Mother's daughters were achieving the appropriate standardized testing scores or whether the curriculum taught [to Mother's daughters at home] met minimum school district standards." (*Id.*) On this record, Mother concludes that the court abused its discretion by ordering the parties to enroll Child in public school when he reaches the appropriate age. We disagree.

This Court has "decline[d] to adopt a bright line rule or presumption in favor of public schooling over home schooling." *Staub v. Staub*, 960 A.2d 848, 853 (Pa.Super. 2008). Instead, "the well-established best interests standard, applied on a case by case basis, governs a court's decision regarding

public schooling versus home schooling." *Id.* at 849.

Instantly, the court's *in camera* interviews with Mother's daughters left it convinced that home schooling was not in Child's best interests:

> [Child] is presently too young to be enrolled in any school. However, Mother has two older children, currently ages six (6) and eight (8), and Mother has been home schooling these children for the entirety of their lives up until this point. For clarification, Mother's two older children are from a previous relationship and are not part of this custody action. Here, the [c]ourt chose to interview the children due to the allegations of sexual abuse involving Father in this current custody matter.
>
> The two older children testified in chambers with counsel present. Based on their testimony, the [c]ourt found both children to be woefully underdeveloped academically. Specifically, the [c]ourt found both children extremely difficult to understand and, the oldest, who was eight years old, was unable to spell her name or identify the initial letter of her name.
>
> \* \* \*
>
> The apparent failure of Mother to provide thorough home schooling even at an elementary level of education for her 6- and 8-year-old children was very concerning to this [c]ourt. Having determined that Mother is not providing anything near an appropriate education for her older children, this [c]ourt is not persuaded that in the near future Mother will be able or willing to provide [Child] with an appropriate education through home schooling.

(Trial Court Opinion at 21-22).

Again, our review of the record supports the court's assertions. R.R.'s ability to spell her name was the first topic that came up during her *in camera* interview. (*See* N.T. *In Camera* Proceedings at 3). The court asked R.R. for her name. Child responded with her first name only. The court asked R.R.

how she spelled her name, and R.R. responded, "I don't remember but." (**Id.**) The court subsequently examined L.R. Despite the court posing age-appropriate questions, many of L.R.'s responses were monosyllabic or inaudible. (**See id.** at 13-15). Under these circumstances, we cannot say that the court erred in deciding that a public education would serve Child's best interests. **Compare Staub, supra** (holding court did not err in denying father's request to prevent mother from continued homeschooling of children; children had significant history of home education, children were doing extremely well being home educated, and mother sought outside resources to supplement home education). Accordingly, we affirm the custody order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/08/2025